MARVEL WELLS, Inc., v. SEELIG.

No. 8619.

Court of Civil Appeals of Texas. Austin.

April 6, 1938.

Rehearing Denied April 27, 1938.

A. J. Lewis and Wallace & Wallace, all of Cameron, for appellant.

E. A. Camp, of Rockdale, for appellee.

BLAIR, Justice.

As concerns this appeal appellee, Albert Seelig, sued appellant, Marvel Wells, Inc., to recover damages to himself and family, and to his land and premises caused by the wind blowing, ashes, dust, and cinders which were emitted from the smokestacks of the plant of appellant operated on the adjacent land of appellant and for the purpose of carrying on its business enterprise of treating mineral waters so as to distil or extract therefrom medicinal salts.

The case of appellee was pleaded, proved, and submitted to the jury upon the theory that the operation of the plant created an actionable private nuisance without regard to any question of negligence. The jury found that in the operation of the plant, ashes, dust, and cinders were emitted from the smokestacks and carried by the wind in, to, and over the land and premises of appellee, resulting in annoyance, inconvenience, and discomfort to appellee and his family; that persons of ordinary sensibilities, tastes, and

habits would be so annoyed, inconvenienced, and discomforted by such ashes, dust, and cinders; and that they caused material injuries and damages to appellee and his family in the use of their home and premises in the sum of $500, and to his land in the depreciation of its market value in the sum of $3,500. Judgment was accordingly rendered for appellee for $4,000; hence this appeal.

Appellee admits that in submitting the issue as to damages to himself and family there was included in the definition of "family" a person not entitled to be so included. He suggests a remittitur of the $500 assessed as damages to himself and family, provided the court shall affirm the judgment awarding him $3,500 as damages for the depreciation in the value of his land.

We have reached the conclusion that the judgment awarding damages to the land cannot be affirmed under the facts adduced by appellee as follows:

Appellee owned 132 acres of land, out of which some 7 acres had been conveyed as a right of way to a railroad. His predecessor in title had sold the mineral water rights in the east 100 acres of the 132-acre tract prior to the time appellee acquired the title to the property. The 32 acres reserved from the mineral water conveyance was the portion of the land on which the residences and other improvements were located. The mineral water rights in the lands were acquired in the name of one Culver, who conveyed the mineral rights in the 100 acres and in several other tracts of land near and adjoining the 100 acres to appellant company, which was to erect a plant for the purpose of distilling or treating the water so as to extract therefrom the medicinal salts. As a part of the conveyance of the land to appellee by his predecessors in title, he acquired certain stock in the corporation. The tract of about 8 acres on which the plant was constructed was acquired long after the mineral water rights in the various tracts of land were acquired. It was situated immediately south or slightly west of south of appellee's 32-acre tract, and was just outside the city limits of Thorndale, Tex. Shortly after appellee acquired his land and stock, the company erected a plant, consisting of large boilers and vats in which the water was heated so as to distill or extract therefrom the medicinal salts; and appellee as a stock holder participated in the meetings and the erection of the plant. This plant was operated by oil burners used in the heating of the water, which did not emit any ashes, dust, or cinders, or cause any annoyance to appellee and his family, except possibly the annoyance occasioned by the noise of the oil burners. In 1934, appellee sold his stock in the appellant company or corporation. Thereafter, because the price of fuel oil was so high, the fuel oil plant could not be operated and was completely destroyed, and there was erected in lieu thereof the plant complained of. It consisted of one 500-horsepower boiler and one 600-horsepower boiler. The smokestacks attached to these boilers were approximately 72 inches in diameter and 125 feet high. The furnaces constructed under the boilers were constructed solely for the purpose of burning lignite, a powdered fuel, which was conveyed to the grates and burners by automatic stokers, and blown over the grates by fans which created a draft through the furnaces and smokestacks, estimated at 15 miles per hour. The plant as constructed was capable of burning 90 tons of lignite per day, or 180,000 pounds, and was capable of distilling about 190,000 gallons of water, out of which about 10 per cent. was left as medicinal salts. The plant was erected in accordance with the best-known mechanical engineering; but according to the undisputed testimony of the engineer who planned and supervised its erection, there would be emitted "fly ash," cinders, and dust, occasioned by the ordinary and careful operation of the plant. Appellee complained of this, and certain mechanical devices, such as spark arresters and other known devices, were used to prevent the escape of ashes, dust, and cinders from the smokestacks; but with all of this care there were still emitted large amounts of ashes, dust, and cinders, which were blown by southerly winds to the land and premises of appellee, particularly the 32 acres. The fine "fly ash," dust, and cinders covered the houses, lots, barns, and grounds around the home of appellee. It sifted through the roof and ceiling and covered the dishes, table, cooking utensils, food, water, bedding, and clothing to such an extent as to materially annoy, inconvenience, and discomfort appellee and his family in the use of their home and premises. The feed stacked for stock on the 32 acres was covered with the ashes, cinders, and dust to such an extent as to

materially injure it. The cinders and dust fell to such an extent that they injured the eyes of those employed in the cultivation of the farm; injured the stock of appellee, and resulted in great annoyance, inconvenience, and discomfort to appellee and his family; and numerous witnesses who inspected the conditions testified that the ashes, dust, and cinders which they saw would cause great annoyance, inconvenience, and discomfort in the use of the premises, and greatly depreciated the value of the land.

■ The case of appellee was pleaded, proved, and submitted to the jury upon the theory that the emission of ashes, dust, and cinders from the smokestacks of the mineral water treating plant, due to the use of lignite as fuel, to the injury of the adjoining property and the annoyance, inconvenience, and discomfort of its owners, appellee and his family, was an actionable private nuisance without regard to any question of negligence or lack of due care in the operation of the plant. The facts so alleged, proved, and found by the jury constituted the operation of the water treating plant an actionable private nuisance without regard to any question of negligence or want of due care in the operation of the plant under the test or rule establishing such a nuisance announced in this and other jurisdictions. Burditt v. Swenson, 17 Tex. 489, 67 Am.Dec. 665; Burrows v. Texas & N. O. Ry. Co., Tex.Civ.App., 54 S.W.2d 1090; Gulf, C. & S. F. Ry. Co. v. Oakes, 94 Tex. 155, 58 S.W. 999, 52 L.R.A. 293, 86 Am.St.Rep. 835; Olivas v. El Paso Elec. Co., Tex.Civ.App., 38 S.W.2d 165; Gainesville, H. & W. Ry. Co. v. Hall, 78 Tex. 169, 14 S.W. 259, 9 L.R.A. 298, 22 Am.St.Rep. 42; Citizens' Planing Mill Co. v. Tunstall, Tex.Civ.App., 160 S.W. 424; 31 Tex.Jur., 420, 421, 429 and 430, §§ 10 and 11, and cases there cited; Dixie Ice Cream Co. v. Blackwell, 217 Ala. 330, 116 So. 348, 58 A.L.R. 1223. The contention of appellant that the facts alleged and proved did not constitute an actionable private nuisance, in absence of allegation and proof of negligence or want of due care in the construction or operation of the plant, is therefore not sustained.

■ Appellant objected, however, to the submission of any issue to the jury, contending that because the instrument selling the mineral water rights in the 100 acres of land was executed in contemplation of the erection and operation of some sort of plant to extract the medicinal salts from the water, and because appellee took an active part in the erection and operation of the plant as a stockholder of the enterprise, he thereby estopped himself by deed and conduct from claiming any injury or damages resulting to his land or to himself and family from the ordinary and careful operation of the plant; and that he could recover only for such injury and damages as were occasioned from the negligent operation of the plant, or the want of due care; and that appellee neither alleged nor proved negligence or want of due care in the construction or operation of the plant. The rule contended for by appellant should apply to injury or damages done to appellee's 100 acres of land in which the mineral water rights were conveyed to the business enterprise engaged in extracting therefrom the medicinal salts. Each party so conveying the mineral water rights in his land contemplated and understood that some sort of plant capable of extracting the medicinal salts would be constructed in order to carry out the business enterprise; and each such tract of land so conveyed constituted a part of the enterprise, whether or not the plant was erected upon it. In consequence of these facts no grantor of such mineral water rights in his land could complain of or recover any damages thereto which were occasioned by the ordinary and careful construction and operation of the plant; but could only complain of or recover for injury and damages to the land constituting a part of the enterprise, which were occasioned by negligence or want of due care in the operation of the plant.

■ No authority is cited directly in point of fact, but an analogous case in fact and on principle is Crawford v. Magnolia Petroleum Co., Tex.Civ.App., 62 S.W.2d 264, wherein the court held that where a lease had been executed for the purpose of carrying on a carbon black enterprise upon the land, that the consideration for the lease authorized the location, construction, maintenance, and operation of the plant upon the lease; and that it would be presumed that the grantors consented to bear all loss and take all profits which incidentally resulted from the exercise of those rights in the proper manner, provided the grantee exercised the rights conferred in the conveyance with due care and without negligence, then no damages were recoverable. The only distinction between the Crawford

Case and the instant case is the fact that in the former the plant was erected upon the leased premises; whereas, in the latter case the plant was on adjacent premises. This distinction cannot be material because all mineral water rights in all lands and all lands held in fee by the corporation constituted a part of its business enterprise; and therefore the owners of the lands constituting a part of the business enterprise could only complain of or recover injury or damages to such lands as were occasioned by negligence or want of due care in the operation of the plant. Such rule does not apply to appellee's 32 acres on which his home, rent houses, and improvements are located. Such were not a part of the land in which the mineral water interests were conveyed to the company or corporation; and with respect to the 32 acres appellee stood in the same position as any other person owning adjacent lands would stand. He was paid nothing for the mineral water in the 32 acres of land, and therefore no theory of estoppel existed which would authorize the injury and damage to this land resulting from the ordinary operation of the plant, so as to create a nuisance without regard to negligence or want of due care; and especially so where the owner did not know, or in the exercise of ordinary care could not have known, the character of plant to be erected.

Nor was appellee estopped to set up his claim of damages to the 32 acres and the improvements thereon, or to himself and family, occasioned by the operation of the actionable private nuisance as above shown without regard to negligence or want of due care, under the rule announced in the case of Houston & E. T. Ry. Co. v. Adams, 58 Tex. 476, 482, wherein it was held that the sale of the right of way to the railroad company, for the purpose of laying its tracks and operating its ordinary railroad business, entitled the company to the right of way and to its use, and that as a matter of law no damages could accrue to·. the grantor from the proper location and construction of the road to the residue of the grantor's property, however much such location and construction may have diminished the value of the residue of the land; and that the only damages which could be recovered in such situation were those resulting from negligence or the want of due care in the ·construction or operation of the railroad. The theory of estoppel so applied by the

court was that the grantor knew as a matter of law that the injury of which he complained would result from the ordinary and careful construction or operation of the railroad; and that the grantor was compensated for such injury in the price paid for the right of way. No such state of facts is presented in the instant case, because the undisputed proof showed that appellee did not know the character of plant that would be erected or operated; nor were any facts known to ,him from which he might have reasonably foreseen the injury to his 32 acres of land, or to himself and family, occasioned by the ordinary and careful construction or operation of the plant. Prior to the erection of the plant appellee sold his stock in the corporation, and ·he had no knowledge or notice of what kind of new plant was to be constructed until after it was constructed and put in operation. He immediately complained of the ashes, dust, and cinders being emitted from the smokestacks; and while appellant's engineer did what he could to correct the trouble, he could not do so, and testified: "The fly ash and dust that comes out there, it's impossible to stop that. The distance it would fly from the stack would depend on the wind."

Even the experts who planned and constructed the plant did not foresee these results from the operation of the plant. So it is manifest that appellee would not be estopped as to the injury to the 32 acres and the improvements thereon, or as to their use by himself and family. Such property and its use were not a part of the business enterprise of extracting medicinal salts from mineral waters in other and different lands, and appellee was paid nothing for any right in the 32 acres; and it appears indisputably that he knew nothing of the character of the new plant and its operation prior to the time it was put in operation.· And the mere fact that he used his team for a day or two in the construction of the new plant, and for which he was paid, does not show acquiescence in the expenditures for the construction of the plant, or an estoppel on his part to complain of the injury to the 32 acres and improvements thereon, or the use of same by himself and family. The rule is settled that where it appears that a person merely assents to or participates in the erection for hire of a plant similar to the one in suit, he would not be estopped to complain of

injury caused by the operation of the plant so as to constitute an actionable private nuisance without regard to negligence or want of due care, unless it appears that he foresaw or might have foreseen in the exercise of ordinary care the injury complained of. Richardson v. Lone Star Salt Co., 20 Tex.Civ.App. 486, 49 S.W. 647; 20 R.C.L. 496, 497, § 12, and cases there cited. And especially is this true where, as in the instant case, the person complaining had no remunerative interest in the operation of the business enterprise. The mineral water rights in the 100 acres of appellee's land were sold outright to appellant prior to the time appellee acquired the land. He sold the stock of appellant which he acquired as a part of the land purchase prior to the erection or operation of the plant complained of, and had no interest therein at the time the present plant was constructed and put in operation.

■ Since damages to the land were submitted as to the entire 132 acres, there is no way of determining the amount assessed as to the 32 acres and the improvements thereon, which necessitates a reversal of the case.

■ In view of another trial, we hold that the trial court did not err in refusing to submit the requested definition of a nuisance and in not requiring the jury to find if such a nuisance existed. The cause was submitted upon special issues, which appropriately required the jury to find from the preponderance of the evidence all the necessary ultimate facts constituting an actionable private nuisance.

■ Nor do we sustain appellant's contention that the nuisance in question was not permanent, and that the trial court erred in assuming that it was in submitting the case to the jury. · The undisputed evidence shows that the erection of the plant itself cost more than $75,000; and that the purchase of lignite mines and other properties in connection with the erection of the plant for the purpose of carrying on the enterprise cost several thousand dollars in addition. The engineer testified that it could not burn any character of fuel except lignite, and that there would be emitted from the smokestacks in the burning of lignite dust, ashes, and cinders to some extent, which because of the location of the plant immediately adjacent to appellee's 32-acre tract of land would cause damages thereto, although he minimized the damages. In this connection, he testified as follows: ᐧ

"The fly ash and dust that comes out there, it's impossible to stop that. The distance it would fly from the stack would depend on the wind. I doubt if any of the cinders could come out and if they did, they would fall near the stack. They are too heavy to fly."

"Q. It is your opinion that they have done all that they can to make a safe plant? A. Yes, sir. ᐧ

"Q. It is your opinion that the plant, as it has been operated during the past months, if it injures anybody, there's no way to prevent that? A. I don't think there is."

"Q. The fuel that they use there is the lowest and cheapest grade of coal known? The poorest grade and cheapest coal known? A. Yes, sir, for commercial purposes. There are other coals, but not used commercially in the United States."

The cause will be reversed and remanded for a new trial.

Reversed and remanded.